Thank you, Your Honor. May it please the court, Kirk Passage on behalf of the student-athletes. In thinking about the argument this morning in the briefing and attempting not to repeat what we addressed in the brief, it struck me that there's one thing that commonly addresses the various issues before the court, whether we talk about injury, standing, sufficient interest, property interest for due process, however we want to view it. And that is these student- athletes and their universities. Now this court recognized in the O'Bannon decision six years ago now that it's primarily the opportunity to learn a higher education that attracts student-athletes to the United States. And Judge Smith, you addressed that same topic last year in the NCAA grant-made antitrust litigation, recognizing in your concurring opinion the requirements imposed upon student-athletes. Now those requirements in terms of their time on campus, their in-person participation, how much time they must be in practices, and the additional 40 hours or so in education, those factors that you recognize in the antitrust case are in the record before this court today, and they were in the record before the court below. Counsel, with respect, I certainly obviously agree with myself in the antitrust context, and I have great sympathy and empathy for your clients, but with respect to your due process claim, what exactly is your protected interest, your legally protected interest? Well, Your Honor, I think Abraham teaches us what the requirement is, which is the voluntary connection. Now we recognize that just having a visa or see the status by itself, that's the point the government makes, is not by themselves alone enough. But we don't have that here. We have student-athletes who were recruited to the United States, who accepted offers and scholarships and grants, and who committed under NCAA regulations to play for these universities. In doing that, they gave up opportunities to attend any other university in the world, understanding that if they attended another university, they would lose their eligibility here under NCAA rules. So this isn't a question of somebody who was just passing through or wanted to attend another university. It's a question of somebody who was actively recruited. They accepted the invitation. They have multiple forms of compensation that they are entitled to receive pursuant to their acceptance of those invitations. Counsel, you know, if your lawsuit were against the universities, I would have a lot easier time with addressing them. My concern is that you've sued the Department of Homeland Security, which, whatever the merits of the arguments that you're making about the students, that's not their role. Their role is to determine who is entitled to come into the United States. And although Ibrahim had a verse, the facts of that were horrific. Other than that, do you have any case law that supports your argument that the interest that you claim you have in due process is legally protected? What case other than Ibrahim would you cite? Well, certainly we will look at Roth, the Board of Regents versus Roth, which is another case that we believe provides guidance. And, you know, these cases involve different things. I mean, Ibrahim, where someone leaves the country for a speaking event. Roth, where you had a college professor whose contract was not renewed. But those cases recognize, as I think this Court well knows, that the boundaries of the U.S. are not a determining factor in whether there's a due process right that may be violated. So we're looking, I think, at those cases, we're looking at the voluntary connection. We acknowledge that we have to establish that voluntary connection, but we don't think that the right remedy is to say that UCLA or Loyola Marymount or some other university is responsible for this. The guidance that was issued by DHS ICE in July and repeated again in August specifically is directed at both the students saying thou shall not come here. But counsel, the March 9th ICE guidance specifically limited its application to continuing and returning international students. Under those circumstances, how was your students reliance reasonable? Well, your honor, as the record reflects, these students enrolled before that time. That guidance on its express phase was limited to just that quarter. It did encourage students to defer their start date. So when the guidance was issued, you would be looking at a spring quarter and a summer quarter, and then you'd be looking at a fall quarter. These students did not come over in spring or summer. They applied. They got their visas. They got their I-20s in May and June before there was any additional guidance issued. So they have legitimate visas issued by the State Department. They had the guidance was issued in August, late July and August, after the government first completely gutted the March guidance and barred international students in total, which was changed at a hearing in a lawsuit. That's when that guidance came out, and the guidance said it didn't tend to be speaking to the fall term. So the students had their visas and they had their I-20s. That's all they needed to have to come into the country. If you construe the March 9th guidance, I'm putting it in layperson's language. If it just said, hey, look, right now we're just focused on the people who've already been here and are continuing. Don't rely on this if you don't fit into that category. If you construe it in that fashion, would you agree that your clients don't really have a legitimate complaint against the Department of Homeland Security on this basis? No, I don't, Your Honor, and for two reasons. They were issued visas, which according to the guidance, they shouldn't have been if there was a problem. And they were issued I-20s, which again, they should not have been if there was a problem. So based on the Department of State's actions and the University's compliance with the guidance, we think it's fine. But there's one other point, which I think is important. The requirement of the guidance was that you engage in a full course of study. I think as was recognized in the antitrust decision by this court, student athletes are engaged in a full course of study. That course of study includes their athletic endeavors. They have one chance, since only 5% of them go on to success in the U.S. But given in the guidance that says, expressly or otherwise, that student athletes who are engaged in a full academic course load and also engaged in athletic competition for their universities where they must be on campus under university supervision, under heightened medical standards, where we all know where they are. I mean, you will see where the UCLA women are on Sunday on television. There's no question about national security here. And the first time ever that DHS ICE construed that guidance to say, no, a student athlete does not count was in the November hearing in the court below. That's when they adopted the position that full-time course of study did not encompass student athletes required to be on campus. That's without comment. That's without justification. That's without notice. So I do think the student athletes, given the invitations that DHS ICE issued in the guidance saying, we hope you will be able to come here, given the 100-year history, given the issuance by the State Department of Visas, given the issuance of I-20s by the universities in accordance with the DHS regulations, and given the requirement that there only be a full course of study, and this court's prior recognition that athletic competition and being a grant-made recipient is part of that, that should have sufficed. I think if DHS ICE wants to treat a small category of international students differently, it has to have a legitimate justification. And it can't do it by taking a new position in a hearing in the trial court that's never previously been published and that DHS ICE refused to We went to DHS ICE. We requested a meeting in early October. We submitted a request and outlined our position. And DHS ICE was stone-cold silent in response. They didn't raise the issues in their briefings. I had to ask Judge Phillips multiple times for what DHS ICE's position was on this issue. And only when pressed did the ASUA answer the question and say our position is that being a on-campus where you're required to be does not constitute part of a full course of study. Now, if that's the rule, we should have been given notice, and these student-athletes should have been given notice, and they were not. Now, if we agree with your position, what remedy do you seek from this court? Well, Your Honor, I think the amended request for a preliminary injunction that we issued below is the appropriate remedy. I recognize that the court in this circumstance and with APA violations often remands the matter for further proceedings to do that, and that may be the appropriate course here. But we are well underway in this basketball season, and the winter sports have already begun. The effect on these students is immediate, and we believe it's irreparable if they're not permitted to come over here. So I think there are a couple of ways to proceed. We have talked about a mandatory injunction, and we talked about a prohibitory injunction, but those are honestly two sides of the same coin. I suppose that DHSI is directed to interpret the full course of study requirement as being satisfied by these 16 student-athletes who have to be on campus six to seven days a week, anywhere from 35 to 70 hours a week. That eliminates the one justification they've offered, which is national security. The second justification they've offered is concerns about the pandemic. Nobody gets more testing, more care, more protection than these student-athletes get, and that's uncontroverted in the record. So this is about as safe as it could be, and frankly, Your Honor, we know how important this is. These are 18-year-old kids, I guess adults now, who are so strongly intent on honoring their commitment to their universities that they would sue the United States government to get that right to come to do what they were invited to do, which the law permits them to do. So I think this voluntary connection, when they entered into an agreement to play for UCLA and Loyola Marymount, that's a contract, just like a professor has, just like anybody else has. That is a property interest, and given that the government has treated student-athletes differently than returning student-athletes, or treated differently than a student-athlete at UC Berkeley who gets one academic unit of credit for doing the exact same thing, whatever the reason is, it's not rational, it's not logical, and it's not set forth. They don't even mention this in their brief. There has been no argument advanced by the government as to why this is not arbitrary and capricious for student-athletes required to be on course. That doesn't constitute part of a full course of study. You want to save some rebuttal time? Barring questions from the court, I'll save what's left and won't use it if I don't need it. Okay, very well. Thank you. All right, Mr. Gralich for the government. Hey, police and court. James Gralich on behalf of the United States. This case isn't just about the 16 student-athletes. It's about the million international students that benefited from ICE's relaxation of on-course standards. Under regulation, students would be required to take primarily in-person classes. And right now, the university systems, 1,300 universities specifically, are on primarily online classes. So without certainty, if this policy is overturned, many international students wouldn't be able to take classes here in the United States. But counsel, isn't Mr. Passage's point a correct one? I mean, think about this on a regular human basis. This is kind of arbitrary and capricious. I mean, it's come on very late. I don't know whether Mr. Miller in the White House or whoever sponsored this, but the reality is this really smacks of something. I don't know exactly what's the justification for this. It isn't because it's taken it online. What's the real justification here? Does the government have a position on that? Your Honor, it's the balancing the interest of students continuing their education with ICE's obligations to monitor students in the country and oversights. But the reality is, as was pointed out, these are student-athletes. Their education, in large part, is on the field. And they will be on the field if they're allowed to come. And that's a significant part of the time that they spend. So what's the justification between what they have here and the people that are returning from before? They're not allowed to go to classes either. How do you justify that? I mean, the justification specifically between returning and continuing students is on a national security basis. There's a long, there's a landscape in legislative history of monitoring students coming to the United States, starting with Ira Iron in 1996, the Patriot Act in 2001, and even in the 2002 proposed rulemaking. It basically says if you're taking all online courses, there's no need to come to the United States. But the difference here is we're not talking about 16 athletes. We're talking about 1.3 million students that ICE has oversigned. That's great. But the reality is you're allowing people from other countries who were continuing and had been involved before to come. Why are they not more of a threat to national security than these new people? Because they have connections to the United States. They've been in this country for about a year or a year or less of going to school, and in some cases, three to four years. The student-athletes, specifically in this case, in the student-athletes, newcoming students don't have these connections. Connection in the sense of what? That they shopped at a 7-Eleven? That they were in dorms? What are we talking about here? A connection, any connection to the United States. How do you know that any of these students here doesn't come from a well-off family and have been here many times? Your Honor, I don't know that. I would be speculating. We're talking in a general purpose for over the hundreds of thousands of students that would be new and incoming students. We don't know what their connections are to this country. That's correct. But at least for the returning students, they do have a connection. They've been here for at least a semester. These students haven't been in the United States. I think that's what we're trying to balance, is allowing students to continue their education, but allowing the federal government to keep its national security mission and monitor these students. But at least by at least taking some credit now, it requires these students to come to campus. I understand this looks unreasonable when you look at the 16 student-athletes. But when you make it a larger issue, it's going to be hard to monitor every single international student that has never been on campus before. They could say they come in and go to UCLA, but they could look in Philadelphia and take online courses. I think this goes back to the rulemaking in 2002 when it said that rulemaking But isn't that true of the continuing students as well? Take UCLA for example. Those students are all online. So let's say we've got A, B, and C who are continuing students, and instead of being at UCLA where the government could monitor them, one's in Philadelphia, one's in New York, and one's in Atlanta. What's the difference? The difference is these students, these continuing students have been to the United States and built connections. What kind of connections? Connections going to school, living on campus, or here in the United States. And that's something that the students don't have here. And that's why we found that there's no due process, right? Why is that so critical? I mean, I don't know whether you've ever lived overseas, but the reality is that when people come from other countries, a good part of the time they're going to be dealing with people from their same country that have the same connections and have very little connection with people in the United States. And I'm struggling with what the difference is between somebody who hypothetically has never been to the United States versus somebody who's been here for a semester. What's the difference? And why is it important for purposes of this regulation that you promulgated? I think it's vetting, really. If they've been in class for a little bit, we know they've been here and attended class and did what they did with the purpose of this program. The purpose of this program is to study, and we have at least known it for a semester that they came to the United States and did that. If they're purely online, they're new students, we don't know if they're actually going to show up to classes. I understand that this is different for the basketball players. They'll have to be here, but at least we have some vetting. We know the returning students, or we believe they will, will come and go to class. What if we as a court construe participating in the sport for which they are recruited as being in an academic program and are involved? What would your response be to that? I think the court would be participating in unlawful rulemaking. This court doesn't have the power to make policy, and that case specifically says that. It's Connell Air Lines Incorporated versus Department of Transportation, a 1988 D.C. Circuit case. If one thing should be clear, it is that courts are not to engage in substantive policymaking. I think that's the biggest issue in this case. If you do what the petitioners and the appellants are asking, this court is not going to do it. They're going to send it back down to the district court, but the district court would be engaging in policymaking. This is something the courts can't do. You're saying that in construing the meaning of a regulation, we're doing something the courts don't do regularly. They do, and the courts do do it, but the regulation here is that it defines study as in a classroom setting. It doesn't define study in being an athlete. Then what happens with the continuing students who are no more, and they're as much on online study as the people who would be coming later? Your Honor, can you rephrase that question? Again, returning to the continuing students. The continuing students are not going to class either, right? That's correct, Your Honor. Okay, so I'm asking what's the difference, for purposes of the rule, between a student who would be coming here and would not be going to classes but would be playing, and the person who is continuing who would not be going to classes but would also be playing. What's the difference except for they're, in quotes, having some connection with the United States, in quotes? I'd be honest, it probably wouldn't be that much a difference in that case. They're both on the same basketball team other than one's on campus taking at least one course and one isn't. And so why is this not arbitrary and capricious? It's not arbitrary and capricious because there's a logic there, and the logic is for continuing, allowing students to continue their education and monitoring. And I know it sounds unreasonable towards the students, but overall, when we're talking about the non-student-athletes, it's a little different. At least the returning students do have have been on campus and having connections with the campus. I think that largely goes to why the due process claim fails. The appellants cite Abraham. As we know, Abraham, the petitioner in Abraham, has substantial connections to the United States. She was a PhD student, had been here for four years, only left the United States for a short period, and was denied admission because she was on a terrorist watch list. And right here, the students in this case don't have those connections. They haven't been on campus. They haven't took any classes here like Abraham. They haven't lived here for any portion that I'm aware of. So there's a major difference between the petitioner in Abraham and the right to bring a due process claim in this case. But next, I also believe that the one thing the district court got wrong was the jurisdictional question. In this case, it goes to standing addressability and causation. I mean, we got this other big elephant in the room, the universities. It's the universities that ultimately issue the I-20s, which are their certificates of eligibility, for the students to come in the case. We don't know if the universities would issue the I-20s otherwise. We don't know that. By trying to determine, so we'd be speculating. Further, the universities could have taken action in this case, just like Cal Berkeley does. As the appellants mentioned in their reply brief, Cal Berkeley gives half credit for student-athletes. That would get them around the guidance and their student-athletes would be at UCLA and LMU student-athletes would be able to enter the country. And lastly, all these plaintiffs aren't entirely the same. Three of the plaintiffs in this case, our appellants, don't even have F-1 student visas. So even if the court would find this arbitrary and capricious, they wouldn't be able to enter the country because they still don't have an approved F-1 visa from the State Department. But we also believe ICE has a strong public interest in equities in this case. As I mentioned, it's national security and enforcement and immigration laws. Since the Supreme Court specifically said that ICE has an interest in enforcing immigration laws. But allowing the Department of Homeland Security and ICE to determine what to do during COVID. I understand we don't want to curb ICE's ability to act on a national emergency and pandemic. I think that also brings us to why the notice and comment procedures wouldn't apply here. The notice and comment procedures, even if we found that it was a substantive, even if the court found there was a substantive rule or change in the law here, would not apply because there's a good faith exception would apply. The good faith exception pretty much is an emergency procedure. And the United Circuits found that and the United States versus Val Verde. And I think there's no doubt there's an emergency in this scenario. I think the fact that I'm appearing and opposing counsels appearing and reminds this court that there's a pandemic out there and it's an emergency. But we also believe the notice and comment procedures will not apply in this case because it's not a permanent change in law or it's just meant to be a policy. But the continuing students are part of the same pandemic issue, are they not? They go home or whatever place and they may have exposure to variant versions of the virus. What's the difference between the continuing students and these new students for purposes of the pandemic? I think a large portion with the returning students, a lot of them are still in the country. But with the new students that would be first time entering, with the student athletes, I think the issue of bringing COVID in is not an issue, but it could be with the other 1.3 million international students. So I think that's the difference between the returning and new students. So the government's position is that this case will govern what happens to 1.3 million students? That is correct, Your Honor. And that's what happens. The court overturns this policy. The normal remedies that vacate or send back for comment and procedure. If the district court vacates in finding it arbitrary and capricious, you're left back with the regulation which requires these students to take basically all online courses other than the three credit hours per semester, quarter, or term. So it's the government's perspective that were we to agree with the plaintiffs in this case that we should send this back to the district court? Your Honor, what... I'll repeat. If we were to agree with Mr. Passage's position, I'm not saying we would, but if we were, is it the government's position that we should send this, remand this to the district court? If you would agree, yes, Your Honor, because the proper procedure would be to vacate it or send it back for comment, our new, I guess, notice and comment procedures. That's not going to change anything. We're not going to, because the court can't make policy, and it'd be going, and if you do with the appellant's one, you're going to, you're going to be determining policy. You're going to be reframing what a court, what it needs to study under the regulation. We're almost out of time. Do either of my questions, or my comments, or questions, or my colleagues have any questions about Mr. Gralich? Gralich. I'd just like to ask Mr. Gralich, where in the DHS was this decision actually made? At what level or what person? Your Honor, I don't know for sure, because I don't want to tell you wrong, but my understanding is it would have been made at CSEVP. I'll be honest, I don't want to speculate. I don't think it's a court incorrect information. Sure. Okay. Thank you. That's all. Judge Wallace, do you have any questions? I don't think so. I have one coming up for the person who's going to do the rebuttal. All right. All right. We thank Mr. Gralich, and Mr. Passage, you want to entertain your rebuttal here. You've got two minutes and 38 seconds. Thank you, Your Honor. Your Honor, one, with Judge Wallace, I think you have a question. I do indeed. Here, as I understand it, we're viewing a preliminary injunction. Is that correct? That is correct. And what is our test for review at this part of this litigation? Your Honor, it's abuse of discretion. I think both we and the government agreed on that standard for purposes of this appeal. So this isn't the end game. This is just whether or not the district court got it right in holding off, as she saw it, until the rest of the cases, and you'll be back on an even keel rather than dealing with abuse of discretion. Now, I read Judge Phillips' opinion very carefully, and I don't see where your argument — your argument goes to the end result of whether this should be done. But she was on — she didn't have to make that decision. She just had to decide what the preliminary should do. And you'd have to show that there's an abuse of discretion the way she wanted to handle it. We want to have time out now and do — I couldn't find the abuse of discretion in her opinion. Could you help me with that? I want to give you a fair shot where I am right now. I appreciate that, Your Honor. And look, one of the things we sought here — we have student of this to try to understand what the U.S. government is saying to them. And I think, at the end of the day, as we explained, particularly, I think, in our reply, we do believe Judge Phillips abused her discretion, much as I respect her. We believe, in this case, she got it wrong, because without the preliminary injunction, there is no remedy for these student athletes. Their seasons will be over before we can get a determination. So that's the standard here. You're making an assumption. When you go back, we don't really know how quickly this can occur. She's a reasonable district judge. That's my view of work in the past. You're assuming that she's going to carry this thing on forever. And there's nothing in the record that shows that she's going to do anything other than expedite the matter. Well, Your Honor, the government hasn't even answered. So we have to wait for the answer. Then we have to file a motion, even if we expedite. The basketball season is over in about six weeks. So this is the only remedy. And I would submit that Mr. Grawlich is painting the picture. He doesn't ever explain why first-year student athletes get treated than other students who are here and took one day of an in-person course. So did this issue come up before Judge Phillips? That is the time that was required and the urgency that you've pressed upon us today. Was that discussed with the district? Yes, Your Honor. Fairly, it was. The government did not oppose, and we thank them for that, did not oppose our request to shorten the time on the hearing on our motion for preliminary injunction. And she did expedite that proceeding. And so she took a close look and thought that it was all right to have a preliminary injunction. And we are now going to say, not that she was right or wrong, but that she abused her discretion. Now, how did you get to that point? That's my, I've listened carefully, but I'm not, I'm not yet convinced. I understand that, Your Honor. I'm cognizant that I'm over my time, but I do want to answer your question. Whenever a judge is asking you a question, keep asking. Thank you, Your Honor. That's true. And I think it does go to the heart of what brings us here. And as I said, we do respect Judge Phillips in her reasoning. I thought she was very thorough. She took supplementary briefing and evidence, so we have no criticisms of that part of what she did. We obviously disagree with her conclusion. And the reason we believe it constitutes an abuse of discretion, I guess there's several pieces to it. And I'll summarize them rather than explain them in detail. Number one, we think the record was clear that the government offered no justification whatsoever for why student athletes required to be on campus does not satisfy the requirement for a full course of study. We think she didn't have to set policy to interpret the regulation any more than this court sets policies in interpreting regulations. That's number one. And when you presented that to her, what was her response? Her response really was we had about an hour and 15-minute long argument in front of her, so that was extraordinarily lengthy. She then asked for additional briefing, evidence, and legal submissions, which we did. We did not argue again before her at that point, but that's when the declarations came in from the 16 student athletes showing their connection to the U.S., explaining the timetables, explaining their visas and I-20s. So we did not have a that evidence was submitted in the government's response to that evidence. So that's one point. The second point where I think there's an abuse of discretion is the record showed that you could be a first-year student online only as long as when you signed up you were supposed to have a course in person. So you have first-year students in this country who have no in-person courses. There's no rational distinction between those students who are permitted to be here and these first-year student athletes. Number three, as we showed with UC Berkeley, they give a little bit of academic credit for doing exactly what UCLA does. There's no basis, and the government has proffered none, for distinguishing between the two other than to suggest that UCLA and LMU could go against the government's instructions, could issue the I-20s. And as this court said in the last point, Your Honor, is where the abuse of discretion is, you can read all of the government's guidance, talk the bottom. At no point in time was there even an attempt to explain why student athletes required to be on campus don't qualify. And that's the end result. But we're talking about abuse of discretion. She outlined in a 20-page outline of her thinking. Now she may be wrong or right, but she won't know until she tries her lawsuit. But we have to say, no, you abused your discretion. You should have moved and given this case at the beginning. That's an imposition on a district court judge that's hard to find here. I've heard your argument. Your argument is on the merits. You should win, and you may well. But why are we wasting time here? Why not get it back to the court, move the case for summary judgment? Because, Your Honor, the basketball season's already started. These student athletes have already missed six weeks of practice. They've already missed games against top competition in the United States. When they come back, whenever that is, they have to quarantine for 14 days. That may be true, but you raised that issue before the district court, I assume. We did, Your Honor, but we're all aware of what's happened in time since November with the second wave, with the new regulations coming, with the travel restrictions that are being here. So, I agree. We're not in a position to take new evidence here to show why she was wrong and abused her discretion there. I agree with that, Your Honor, and I'm not trying to make that point. What I'm saying is, I agree what we have said before her. The record before you is what the record was before her. I would suggest that the difference, I suppose, in where I'm coming from and where you're coming from, Your Honor, is we think the evidence and arguments we've made demonstrate an abuse of discretion. And what I think you're saying is, you may have shown Mr. Passage that she's wrong. She may or may not be wrong, but I don't think you've shown an abuse of discretion. And what I would say is, if that is your conclusion, I would certainly respect it. I understand it's a heightened standard. We believe we've met the standard, but I certainly would respect this court if it disagreed with our view. And Mr. Passage, let me say, if your plaintiffs around the world are live streaming this, I hope they see that they, first of all, had a fine attorney representing them who's done a wonderful job here. And, you know, that judges really don't like it when the government chastises us about, you don't have the power to do this or that, when their power in their mind is virtually unfettered. But, you know, regardless of the argument from the government, Judge Wallace makes, I believe, a very strong point that our justice system will take things in course, will follow its rules, and can't just bend the rules because of sympathy or empathy. And I have, and I know Judge Smith and Judge Wallace have tremendous sympathy and empathy for your plaintiffs all around the world who are in a very, very difficult situation. Many, many people have suffered wrongs under this COVID situation, and they may be in that category for sure. And we have tremendous concern for them, but we have to follow the law and make our decisions based on that. So I just wanted to say that to the people out there. Thank you. All right. Unless either of my colleagues additionally have questions, we'll let you go over some answer over time. We thank both counsel for your argument. This is an interesting and difficult case, and we assure counsel that we will give this prompt attention and get an answer as soon as possible because we know time is of the essence. But the case just argued of Doe's versus Homeland Security is submitted, and the court is adjourned for the week. Thank you, Your Honor. Good job, Your Honor. This court for this session stands adjourned.
judges: Wallace, M. Smith, Lasnik